No. 24-13106-JJ

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**UNITED STATES OF AMERICA**,
Appellee,

v.

**JOSE RIVERA**,
Appellant.

On appeal from the United States District Court
for the Northern District of Georgia

# CORRECTED BRIEF OF APPELLANT JOSE RIVERA

KENDAL D. SILAS
Federal Defender Program, Inc.
101 Marietta Street, NW, Suite 1500
Atlanta, GA 30303
(404) 688-7530
Kendal_Silas@FD.org

Counsel for Jose Rivera

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(a), counsel certifies that the following have an interest in the outcome of this appeal:

Buchanan, Ryan K., Former United States Attorney

Johnson, Hon. Walter E., United States Magistrate Judge

Kearns, Stephanie A., Former Executive Director, Federal Defender Program

Leipold, III, Calvin Artie, Assistant United States Attorney

Moultrie, Jr., Richard S., Acting United States Attorney

Ray, II, Hon. William M., United States District Judge

Rivera, Jose, Appellant

Silas, Kendal D., Attorney for Appellant

Silas, V. Natasha Perdew, Executive Director, Federal Defender Program

Sneed, Sekret T., Assistant United States Attorney

Sommerfeld, Lawrence R., Assistant United States Attorney

United States of America, Appellee

No publicly-traded company or corporation has an interest in the outcome of this case or of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Jose Rivera requests oral argument. The additional opportunity for counsel to address the applicable law in concert with the relevant portions of the record would likely aid the court's decisional process.

# TABLE OF CONTENTS


Certificate of Interested Persons and Corporate Disclosure Statement..... C-1

Statement Regarding Oral Argument ........................................................ i

Table of Citations ........................................................................................ iv

Statement of Jurisdiction ..............................................................................1

Statement of the Issues .................................................................................2

Statement of the Case ...................................................................................3

A. Course of Proceedings and Disposition Below ..............................3

B. Statement of Facts ..............................................................................14

C. Standards of Review .........................................................................20

Summary of the Argument .........................................................................22

Argument and Citation of Authority ..........................................................25

I. The District Court Erred in Sentencing Mr. Rivera Based on the Guideline for Attempted Murder and Assault with Intent to Commit Murder. ..........................................................................25

II. Assuming Arguendo that the District Court Did Not Err in Applying Guideline § 2A2.1, It Erred in Applying the Base Offense Level for Attempted First Degree Murder. ..............................36

III. The District Court Erred in Imposing the Six-Level Enhancement under Guideline § 3A1.2(c)(1) for Official Victim. .......41

IV. The District Court Substantively Erred by Sentencing Mr. Rivera to Serve 220 Months in Custody Despite Attendant Mitigating Circumstances.........................................................................47

Conclusion....................................................................................................50

Certificate of Compliance and Service ...........................................................51

## TABLE OF CITATIONS

### Federal Cases

*Alvarado-Linares v. United States*,
44 F.4th 1334 (11th Cir. 2022) ....................37

*Bonner v. City of Pritchard*,
661 F.2d 1206 (11th Cir. 1981) ....................37

*Braxton v. United States*,
500 U.S. 334 (1991) ....................27, 32, 34

*Chapman v. United States*,
500 U.S. 453 (1991) ....................43

*Elonis v. United States*,
575 U.S. 723 (2015) ....................27

*Gall v. United States*,
552 U.S. 38 (2007) ....................20

*Moran v. Burbine*,
475 U.S. 412 (1986) ....................18

*Nelson v. United States*,
129 S. Ct. 890 (2009) ....................48

*North Carolina v. Alford*,
400 U.S. 25 (1970) ....................5

*Ruan v. United States*,
597 U.S. 450 (2022) ....................27

*United States v. Banks*,
778 Fed. Appx. 694 (11th Cir. 2019) .................... 20-21

*United States v. Campa*,
459 F.3d 1121 (11th Cir. 2006) ....................22

*United States v. Chambliss*,
267 Fed. Appx. 870 (11th Cir. 2008) ....................20

*United States v. Chisolm*,
559 Fed. Appx. 800 (11th Cir. 2014) ....................................................20

*United States v. Crawford*,
407 F.3d 1174 (11th Cir. 2005) ....................................................19

*United States v. DeVegter*,
439 F.3d 1299 (11th Cir. 2006) ....................................................19

*United States v. Dreiling*,
806 Fed. Appx. 888 (11th Cir. 2020) ....................................................26

*United States v. Ettinger*,
344 F.3d 1149 (11th Cir. 2003) ....................................................45

*United States v. Free*,
574 F.2d 1221 (5th Cir. 1978) ....................................................37

*United States v. Gonzales*,
931 F.3d 1219 (10th Cir. 2019) ....................................................43

*United States v. Green*,
375 Fed. Appx. 940 (11th Cir. 2010) ....................................................48

*United States v. Hampton*,
628 F.3d 654 (4th Cir. 2010) ....................................................43

*United States v. Ingle*,
460 Fed. Appx. 593 (6th Cir. 2012) ....................................................39

*United States v. Irey*,
612 F.3d 1160 (11th Cir. 2010) ....................................................21

*United States v. Jackson*,
728 Fed. Appx. 969 (11th Cir. 2018) .................................................... 44-45

*United States v. Kuhlman*,
711 F.3d 1321 (11th Cir. 2013) ....................................................20

*United States v. Lamott*,
831 F.3d 1153 (9th Cir. 2016) ....................................................43

*United States v. Lawrence*,
47 F.3d 1559 (11th Cir. 1995) ....................................................................40

*United States v. Miller*,
73 F.4th 427 (6th Cir. 2023) ......................................................................26

*United States v. Ortiz*,
318 F.3d 1030 (11th Cir. 2003) ..................................................................26

*United States v. Shaw*,
701 F.2d 367 (5th Cir. 1983) ................................................................38, 40

*United States v. Sikes*,
2024 WL 3220708 (11th Cir. 2024)...........................................................40

**Federal Statutes & Rules**

18 U.S.C. § 111.............................................................................................32

18 U.S.C. § 922...................................................................................3, 22, 25

18 U.S.C. § 924(c) ........................................................................................32

18 U.S.C. § 1111(a) ...................................................................11, 27, 35, 37

18 U.S.C. § 1114...........................................................................................32

18 U.S.C. § 3231.............................................................................................1

18 U.S.C. § 3553(a) ................................................................................ 47-48

18 U.S.C. § 3742.............................................................................................1

28 U.S.C. § 1291.............................................................................................1

FED. R. APP. P. 4(b)(1)(A) ...............................................................................1

FED. R. APP. P. 32(a) ......................................................................................51

U.S.S.G. § 2A2.1(a)(2)..........................................................................11, 25, 36

U.S.S.G. § 3A2.1(c)(1) ....................................................................................43

U.S.S.G. § 5H1.3 ...................................................................................12, 31, 49

NO. 24-13106-JJ

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**UNITED STATES OF AMERICA,**
Appellee,

v.

**JOSE RIVERA,**
Appellant.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case under 18 U.S.C. § 3231 because an indictment was filed charging Mr. Rivera with one or more federal crimes. This is a direct appeal from an order and judgment of the district court; the Court of Appeals has jurisdiction over this appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. Mr. Rivera filed the notice of appeal on September 18, 2024, within 14 days of the entry of the district court's judgment and commitment order. FED. R. APP. P. 4(b)(1)(A). This appeal is from a final order of the district court that disposes of all the parties' claims in this case.

## STATEMENT OF THE ISSUES

I. Whether the district court erred in sentencing Mr. Rivera under the guideline for attempted murder and assault with intent to commit attempted murder when he was convicted of two firearms possession offenses?

II. Assuming arguendo the district court did not err in applying the attempted murder guideline, whether it erred in applying the base offense level for first degree attempted murder?

III. Whether the district court erred in imposing the six-level enhancement under guideline § 3A1.2(c)(1) for official victim?

IV. Whether the district court abused its discretion in sentencing Mr. Rivera to serve 220 months in custody despite mitigating circumstances relating to Mr. Rivera's mental state at the time of the offense and his history and characteristics?

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition Below

On February 8, 2023, a grand jury in the Northern District of Georgia returned an indictment charging Jose Rivera with possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1) and possession of a stolen firearm in violation of 18 U.S.C. § 922(j). (Doc. 1). Both charges related to the same Taurus 9mm pistol and had the same offense date of November 17, 2022. (Doc. 1).

Mr. Rivera entered a non-negotiated plea of guilty to both charges in the indictment.[1] (Doc. 71). Mr. Rivera and defense counsel informed the court during the change of plea hearing that Mr. Rivera had no independent recollection of the factual events that led to the charges against him but that since his arrest Mr. Rivera had seen video recordings which depicted the events underlying the charges. (Doc. 99 at 17-29).

Defense counsel explained that Mr. Rivera has a history of suffering from bipolar disorder with psychotic features and schizoaffective disorder and that before the events on November 17, Mr. Rivera had ingested methamphetamine and consumed another substance that a person had placed into his drink. (Doc. 99 at 18-19). The Defense's position was that Mr. Rivera had experienced a psychotic episode due to the combined

---

[1] Prior to entering the guilty plea, Mr. Rivera litigated several pretrial motions, including a motion to suppress statements. (Docs. 13, 16).

effects of his mental illness and the substances he had ingested. (Doc. 99 at 20).

The factual basis for the plea was that in the early morning hours of November 17, 2022, Mr. Rivera broke into a consignment shop in Cartersville, Georgia, where he located and took a Taurus model PT99 9mm pistol, and that at around 6:00 a.m. outside a Circle K gas station in Cartersville, Mr. Rivera discharged the gun, shattering the glass door of the gas station.[2] (Doc. 99 at 17). Mr. Rivera fled on foot from a police officer who responded to the gas station and discharged the Taurus pistol again. (Doc. 99 at 17-18). The officer returned fire, striking Mr. Rivera, who then dropped the Taurus pistol. (Doc. 99 at 18).

During the plea colloquy, Mr. Rivera stated that he did not remember the events at the consignment shop or the gas station, but he acknowledged that he had seen evidence, namely video, that showed he had taken a gun from the consignment shop and discharged a gun while at the gas station.

In response to the court's questions, Mr. Rivera stated that he did not remember making a decision to commit the acts charged and did not know whether he had intended to do them. (Doc. 28). He acknowledged that he was pleading guilty based on the evidence that the Government had because he believed he could be convicted if the case were to go to trial and that he thought it was in his best interest to plead guilty. (Doc. 99 at 28-29).

---

[2] The bullet lodged into the metal door frame of the glass door. (Doc. 99 at 17).

The Court accepted the plea, noting that it was, in part, based on and supported by the Supreme Court precedent of *North Carolina v. Alford*, 400 U.S. 25 (1970). (Doc. 99 at 31).

The pre-sentence report recommended a cross-reference from United States Sentencing Guidelines § 2K2.1, the guideline for firearms offenses, to § 2A2.1, the guideline applicable to assault with intent to commit murder or attempted murder, because § 2A2.1 produced a higher offense level and higher resulting Sentencing Guideline range. (PSR ¶¶ 39-40). The recommended cross-reference was premised on an assertion that Mr. Rivera shot at Carterville Police Sergeant Logue and, therefore, committed an attempted murder. (PSR ¶ 39). Mr. Rivera objected to the cross-reference. (PSR ¶¶ 39-40).

Mr. Rivera appeared before the district court for sentencing on September 6, 2024. The Government called Sgt. Logue as a witness. (Doc. 98 at 30). Sgt. Logue testified that he believed Mr. Rivera shot at him. (Doc. 35). He testified that as he chased Mr. Rivera behind the Circle K gas station, Mr. Rivera rounded a corner of the building, then jumped out, pointed the gun at him, and fired a round at him. (Doc. 98 at 34). He testified that the muzzle flash "[went] right towards [him]" and that he felt the bullet pass the left side of his head. (Doc. 98 at 34-35).

The Government introduced as an exhibit a copy of Sgt. Logue's body camera video relating to the incident at the Circle K gas station. The

Government played portions of the video during the hearing, including the encounter with Mr. Rivera. (Doc. 98 at 101, 107).

The Defense called Dr. Wanda Shao as a witness. (Doc. 98 at 43). In conjunction with Dr. Jason Hall, Dr. Shao performed a forensic psychological evaluation of Mr. Rivera. (Doc. 98 at 68; Doc. 87-2). Dr. Shao is primarily employed through the Georgia Department of Behavioral Health and Developmental Disabilities at Georgia Regional Hospital. (Doc. 98 at 43). She is the associate clinical director of forensic services at Georgia Regional Hospital and the director of forensic education training for DBHDD. (Doc. 98 at 44). Dr. Shao also has a small private practice. (Doc. 98 at 43). Dr. Hall is a forensic psychologist at Georgia Regional Hospital. (Doc. 98 at 47).

Dr. Shao and Dr. Hall diagnosed Mr. Rivera with several mental health conditions: (1) Bipolar I Disorder with psychotic features; (2) Post-Traumatic Stress Disorder based on Mr. Rivera's history of being sexually and physically abused when he was young and witnessing extensive violence in childhood; (3) Substance Use Disorders, including cocaine; (4) Stimulant Use Disorder, which would include cocaine and methamphetamine; and (5) Cannabis Use Disorder. (Doc. 98 at 61-62, 89; Doc. 87-2 at 19-23). Dr. Shao testified that based on the witness statements, and other discovery materials she had reviewed, including store surveillance videos of Mr. Rivera at the consignment shop and the Circle K gas station, Sgt. Logue's bodycam video of his encounter with Mr. Rivera,

and video of Mr. Rivera at another store on the evening before the Circle K incident, Mr. Rivera appeared to be severely manic and psychotic at the time of the offenses. (Doc. 98 at 48-49, 62; Doc. 87-2 at 1-2, 11-14). Dr. Shao noted that Mr. Rivera was in a disorganized mental state, appeared to be screaming nonsensical statements like that his family had been killed,[3] that he had what appeared to be extremely high energy, and that he was irritated and behaving very, very erratically. (Doc. 98 at 63). Dr. Shao also highlighted witness accounts that Mr. Rivera said his grandchildren were killed and then said on the way to the hospital that they were not killed. (Doc. 98 at 63). Dr. Shao testified that she believed Mr. Rivera's mental state and his resulting behavior at that time of the offenses arose from a combination of his substance use and mental illness. (Doc. 98 at 46-47, 86, 112, 115). It is very possible, she testified, that Mr. Rivera's substance use triggered the psychotic feature of his preexisting mental illness. (Doc. 98 at 114-115).

Dr. Shao opined that Mr. Rivera was experiencing a significantly reduced mental capacity at the time of the offenses, including the encounter with Sgt. Logue. (Doc. 98 at 68, 83). She noted that Mr. Rivera "was operating in a very disorganized and thoughtless way," waiving the

[3] Four days after the incident, Georgia Bureau of Investigations Special Agent Nicholson interviewed Mr. Rivera at the Bartow County Jail. (Doc. 98 at 82; PSR ¶ 25). Mr. Rivera said that no one had killed his family and that he was hallucinating when the incident occurred. (Doc. 98 at 82; PSR ¶¶ 25-26; Doc. 87-2 at 13).

gun in the air after taking it from the consignment shop, screaming at random cars and strangers instead of concealing the gun and running away, and shouting nonsensical things in response to the directives of Sgt. Logue. (Doc. 98 at 69).

Dr. Shao also opined that Mr. Rivera had a greatly diminished ability to fully appreciate whether his conduct was right or wrong and the harm to others that might ensue from his actions. (Doc. 98 at 82-83). She explained that Mr. Rivera could not have been able to hold the train of thought in his mind that "they killed my family" and then come up with a rational story in that instance of what was happening. (Doc. 98 at 83).

Dr. Shao further testified that Mr. Rivera's mental health and substance use disorders are treatable and there are effective medications and modes of administration available for Mr. Rivera's mental health conditions. (Doc. 98 at 60-61, 84). She also testified that treatment for his mental health conditions and his substance use disorders would significantly limit the risk he poses to the community. (Doc. 98 at 60-61, 115). Dr. Shao stated that Mr. Rivera is horrified by what occurred and that there are strong indications since the incident that he wants both mental health and substance abuse treatment, as he has been consistently asking for treatment while in custody, he has been compliant with medication since his arrest, and he made requests for adjustments of his medications, which shows both insight and a strong motivation to continue medication. (Doc. 98 at 60, 87, 115).

Dr. Shao testified that she and Dr. Hall each independently evaluated Mr. Rivera for Antisocial Personality Disorder, and each concluded that he did not have that condition, which she described as the strongest predictor and risk of a person committing crime and hurting other people. (Doc. 98 at 88). She said that Mr. Rivera showed a desire to connect with other people. (Doc. 98 at 88-89).

On cross-examination, Dr. Shao explained that with mania, a person's thoughts are scattered rather than coherent. (Doc. 98 at 97). She added that "when someone is in a psychotic and manic state, they don't have the ability to form the very coherent thoughts and the ability that we have to logically think to jump from A to B to C to D to E. There's just A to B and reactive." (Doc. 98 at 107). In reference to Mr. Rivera discharging the firearm as he was being chased, Dr. Shao said, "[L]ooking at how we process thoughts, there isn't another layer. It's running, running, okay, I'm deciding to stop, turn and shoot." (Doc. 98 at 109).

In response to questioning from the court, Dr. Shao testified that she thinks Mr. Rivera's hiding the gun from Sgt. Logue shows a definite awareness that he should not be showing a gun in that moment. (Doc. 98 at 74). Dr. Shao also acknowledged that it was very possible that Mr. Rivera was aware that Sgt. Logue was an officer in front of him, as Mr. Rivera ran from him. (Doc. 98 at 95). But she added that she did not know whether Mr. Rivera knew that Sgt. Logue was a police officer, because Mr. Rivera was not "holding a very solid train of thought" at the time. (Doc. 98 at 99).

The court asserted to Dr. Shao that the only logical conclusion was that Mr. Rivera knew that Sgt. Logue was a police officer if he hid the gun from Sgt. Logue but did not hide the gun from anyone else. (Doc. 98 at 100). While she conceded the court's point, Dr. Shao indicated that concluding Mr. Rivera knew Sgt. Logue was a police officer rested on a presumption. (Doc. 98 at 101, 111).

Dr. Shao did not agree that Mr. Rivera's hiding the gun from Sgt. Logue meant that he knew he couldn't have a gun because of his prior convictions. (Doc. 98 at 104). Dr. Shao explained that she did not believe that Mr. Rivera was capable of forming those thoughts at the time. (Doc. 98 at 104). She stated, "[H]e's thinking, if I show my gun, the officer is going to shoot me because I have a gun and I don't want to be shot." (Doc. 98 at 104-105). She added that she knew Mr. Rivera ran because Sgt. Logue had a gun pointed at him. (Doc. 98 at 105). She explained that Mr. Rivera was so erratic and disorganized that he was only acting on one-step registration of what was in front of him. (Doc. 98 at 106-107).

She acknowledged that there are manic people who can appreciate what is right and wrong. (Doc. 98 at 75). She also said that it is very possible that Mr. Rivera thought his family was shot by officers, and so he was fleeing from them and then shot back. (Doc. 98 at 78-79). Mr. Rivera had not specified who "they" were when he said to Sgt. Logue before running that they killed his kids. (Doc. 98 at 81, 97).

The court asked Dr. Shao what made her think that Mr. Rivera did not appreciate the character of his conduct that night based on his medical records and knowing that he had used drugs and the way that he was acting. (Doc. 98 at 76). Dr. Shao acknowledged that an argument could be made that sided with the court's view. (Doc. 98 at 76). She said, "[Mr. Rivera] knew officers were there; he's running; and firing at an officer is wrong." (Doc. 98 at 76). Although she and Dr. Hall considered that perspective, they found the evidence of his disorganized mental state to be more compelling, particularly Mr. Rivera's statements both before and after the encounter with Sgt. Logue that "they" killed his family and the reporting by Cartersville Police Officer McArthur, who rode to the hospital with Mr. Rivera, that Mr. Rivera vacillated between saying the guy I killed was the cop that killed my family and the cop I killed was not the cop that killed my family. (Doc. 98 at 76-77).

Over Mr. Rivera's objection, the district court applied the cross-reference to § 2A2.1 pursuant to § 2K2.1(c). (Doc. 98 at 139). It also applied the base offense level for attempted first degree murder, which is the higher of two alternative base offense levels under 2A2.1.[4] (Doc. 98 at 139). After noting that the Government's burden of proof was by a preponderance, the district court stated:

> It is most believable to me that while the defendant was having some underlying psychological issues that night enhanced, no

[4] The alternative base offense level under § 2A2.1 applies to attempted second degree murder. U.S.S.G. § 2A2.1(a)(2); 18 U.S.C. § 1111(a).

> doubt, by the meth that he smoked, that he knew the police officer was a police officer, he knew it was wrong to have the gun and to be threatening people, and certainly knew it was wrong to shoot at the police officer, and that he intended to shoot at the police officer. The court also believes that he was trying to hit the police officer. . . And it's more believable than not to me that he was trying to kill the police officer. That would have accomplished his purpose to get away, as far as he knew, because no one else was quite yet there.

(Doc. 98 at 138). The court stated that it did not find Dr. Shao's testimony to be credible. (Doc. 98 at 135). The court expressed a view that Dr. Shao's testimony was inconsistent regarding what could be gleaned about Mr. Rivera's knowledge during the encounter with Sgt. Logue. (Doc. 98 at 135-136). The Court also indicated that it found the Government had met its burden of proof regarding the official victim enhancement, stating that Mr. Rivera "was intending to cause harm to the police officer or at least put him in reasonable apprehension of receiving a serious injury." (Doc. 98 at 138).

Based on those findings, the court determined that the adjusted offense level was 39. (Doc. 139). The court granted Mr. Rivera's request for a downward departure under Sentencing Guideline § 5H1.3 for Mental and Emotional Conditions. (Doc. 198 at 144-145, 181-182). The court granted a departure of one level, making the applicable offense level 38. (Doc. 181-182). The applicable criminal history category under the Guidelines was II. (PSR p. 25; Doc. 98 at 184). The resulting Sentencing Guideline range was 188 to 235 months. (Doc. 98 at 181-182, 184). The district court sentenced

Mr. Rivera to serve 110 months consecutively on each of the two counts for a total of 220 months. (Doc. 98 at 184-185; Doc. 91 at 2). The court also sentenced Mr. Rivera to serve three years on supervised release following the custodial sentence and to pay a special assessment fee of $200 and restitution in the amount of $300. (Doc. 91 at 3, 6).

Mr. Rivera preserved his objections to the Court's calculations of the Guidelines, including the cross-reference to § 2A2.1, the calculation of the base offense, and the application of the official victim enhancement. (Doc. 98 at 192). Mr. Rivera also preserved objections to the substantive reasonableness of the sentence, the procedural reasonableness of the sentence to the extent the Guidelines calculation was implicated, and the Court's decision to not grant a greater departure. (Doc. 98 at 192-193). Mr. Rivera timely filed a notice of appeal to this Court. (Doc. 92). He is currently serving the imprisonment sentence in the custody of the Bureau of Prisons.

**B. Statement of Facts**

Jose Rivera is 47 years old. (PSR ¶ 73). He experienced a deprived and impoverished upbringing. (Doc. 2 at 2-3; PSR ¶ 77). During his childhood, he was both physically and sexually abused. (Doc. 98 at 51; Doc. 87-2 at 3). There was a great deal of violence in Mr. Rivera's home and neighborhood. (Doc. 98 at 51-52; Doc. 87-2 at 2-4; PSR ¶¶ 77-78). His mother and stepfather were addicted to drugs. (Doc. 87-2 at 3-4). His uncle and many others around him also used drugs. (Doc. 98 at 52; Doc. 87-2 at

3). In adolescence, Mr. Rivera began using drugs himself. (Doc. 87-2 at 6; Doc. 98 at 52). Mr. Rivera started smoking marijuana at age thirteen, and at age fourteen, Mr. Rivera started using cocaine a lot. (Doc. 87-2 at 6-7; PSR ¶¶ 95.i, 95.ii). He began using methamphetamine in 2020, when he was approximately 42. (PSR ¶ 95.iii.; Doc. 87-2 at 6).

Mr. Rivera also developed mental illnesses. He was diagnosed with conditions that included Bipolar I Disorder with psychotic features, Schizoaffective Disorder, Panic Disorder without agoraphobia, Depression, Anxiety, and Cannabis Abuse. (Doc. 87-2 at 5, 7-10; PSR ¶ 3; Doc. 98 at 53-54).

In 2020, Mr. Rivera and his girlfriend moved from New Jersey to Cartersville, Georgia for a fresh start in life. (Doc. 87-2 at 4; PSR ¶ 87). Mr. Rivera obtained employment at a factory in Cartersville. (Doc. 87-2 at 4, 7; PSR ¶ 99.iii). By November 2022, he was homeless and living on the streets in Cartersville, as he had lost his employment, had no family support in the area, and his girlfriend had moved out-of-state. (Doc. 87-2 at 4-5; PSR ¶¶ 99.i, 99.ii; Doc. 87-2 at 14).

In the early morning of November 17, 2022, Mr. Rivera encountered a friend he knew on the streets as "Big Bob." (Doc. 87-2 at 14). "Big Bob" had a bowl containing a substance, from which he offered Mr. Rivera to smoke. (Doc. 87-2 at 14). Mr. Rivera did. (Doc. 87-2 at 14). Mr. Rivera believed that the substance was methamphetamine. (Doc. 87-2 at 14). "Big Bob" also asked Mr. Rivera if he wanted some "water." (Doc. 87-2 at 14). "Big Bob"

then poured some of the substance into Mr. Rivera's Pepsi drink, and "Big Bob" left. (Doc. 87-2 at 14). Mr. Rivera had not ever consumed "water" before, but on that morning, he drank from the Pepsi containing the poured substance. (Doc. 87-2 at 14). When interviewed by an Investigator with the Georgia Bureau of Investigations approximately four days after the incident, Mr. Rivera said that "[s]ome people call ['water'] date rape. Something like that." (Doc. 87-2 at 14). Mr. Rivera added that "Big Bob" overdid it when he poured the substance into his drink, and that Mr. Rivera believed "the 'water' got a lot to do with what happened [afterwards]." (Doc. 87-2 at 14).

After he consumed the methamphetamine and the "water," events unfolded that Mr. Rivera has no recollection of. (PSR ¶ 93; Doc. 87-2 at 13-14). Mr. Rivera took a large rock and broke the front glass door of a consignment shop. (Doc. 87-2 at 10-11; PSR ¶ 20; Doc. 85-2). Mr. Rivera went behind the counter and took a Taurus handgun. (Doc. 87-2 at 10-11). Those events are recorded on the store's surveillance video. (Doc. 87-2 at 10-11).

Around 6:00 a.m. that morning, Mr. Rivera was in the parking lot of a nearby Circle K gas station. (Doc. 87-2 at 11). By that time, Mr. Rivera was hallucinating. (Doc. 87-2 at 13). Mr. Rivera encountered a patron in the parking lot who had just exited the store. (Doc. 87-2 at 11). Mr. Rivera said to the patron multiple times, "Boy, get back in your truck." (Doc. 87-2 at 11; PSR ¶ 16). After the patron got into his truck, which was parked next to

curb in front of the store, Mr. Rivera pointed the gun at him through the front windshield, and he yelled multiple times, "Boy, who runs this town," and he said they killed his son. (Doc. 87-2 at 11; PSR ¶ 17).

While talking to that patron seated in the truck, Mr. Rivera discharged the pistol but not in the direction of the patron. (PSR ¶ 17). It is not clear that he fired the shot intentionally. The shot shattered the front door glass of the store, and the bullet lodged in the metal door frame.[5] (PSR ¶¶ 17-18; Doc. 85-1). The manager of the gas station called the police. (PSR ¶ 15). Multiple officers of the Cartersville Police Department responded to the 911 call from the gas station. (PSR ¶ 9). Sgt. Logue arrived first. (PSR ¶ 10). Sgt. Logue pulled his car near Mr. Rivera in the parking lot, exited his vehicle, and pointed his gun at Mr. Rivera. (Doc. 86 at 00:00-00:48). He kept his gun pointed at Mr. Rivera. (Doc. 86 at 00:00-00:48). Sgt. Logue told Mr. Rivera several times to show his hands. (Doc. 86 at 00:00-00:20). Mr. Rivera responded by saying, "Keep Going," "Why," "They killed my family," "You got a gun on me," "Really, you got a gun on me," "You can't shoot me," and "I don't got no gun [sic]." (Doc. 86 at 00:00-00:40). Rivera generally kept at least one of his hands behind his back. (Doc. 86 at 00:00-00:40). Only briefly did he show both of his hands. (Doc. 86 at 00:15-00:20).

While Sgt. Logue demanded repeatedly that Mr. Rivera get on the ground, Mr. Rivera began backing away from Sgt. Logue and towards the

---

[5] The gas station surveillance cameras recorded video of the events inside and outside the store, including some of Mr. Rivera's conduct.

side of the Circle K store building. (Doc. 86 at 00:20-00:48). Eventually, Mr. Rivera began running around the side and rear of the building. (Doc. 86 at 00:46-00:56). Sgt. Logue ran after him. (Doc. 00:46-00:56). While at the back of the building, Sgt. Logue called over his police radio that Mr. Rivera had what appeared to be a gun. (Doc. 86 at 00:53-00:56). As Mr. Rivera rounded the second corner at the rear of the gas station building, he turned back towards Sgt. Logue and fired a shot from the handgun he had. (Doc. 86 at 00:53-01:00). Sgt. Logue fired several shots immediately afterward, striking Mr. Rivera once in the area of his right upper thigh and once in his right foot. (Doc. 86 at 00:56-01:07; Doc. 87-2 at 13).

Mr. Rivera fell to the ground when he was shot. (Doc. 86 at 01:00-01:09). The gun he had held fell forward out of his hands and came to rest under a car near a gas pump. (Doc. 86 at 01:00-02:27). A Cartersville Police officer handcuffed Mr. Rivera as he lay on the ground. (Doc. 86 at 01:07-01:38). Sgt. Logue retrieved the gun from under the car. (Doc. 86 at 03:53-03:59).

Mr. Rivera was transported via ambulance to the Piedmont Hospital in Cartersville, which was nearby. (Doc. 87-2 at 12-13). Corey Payne, one of the emergency medical technicians, recalled that inside the ambulance on the way to the hospital Mr. Rivera "'kept saying that . . . they try to kill my kids and grandkids.'" (Doc. 87-2 at 12-13). Cartersville Police Officer McArthur, who escorted Mr. Rivera to the hospital noted that Mr. Rivera said, "The guy I shot was the cop that killed my family." (Doc. 87-2 at 12).

Mr. Rivera said to Officer McArthur, "'I need you to know that the cop I killed was not the cop that killed my family.'" (Doc. 87-2 at 12). Officer McArthur recalled minutes afterward Mr. Rivera would revert to his original statement about the officer having killed his family. (Doc. 87-2 at 12).

Mr. Rivera was experiencing excruciating pain from the gunshot wounds when he arrived at the hospital. Within ten minutes after he reached the hospital, the staff administered morphine to him intravenously for pain. (Doc. 87-2 at 13; Doc. 52 at 4). Approximately an hour later, Georgia Bureau of Investigation Special Agent Daniel Nicholson entered the hospital trauma area where Mr. Rivera was being held. (Doc. 52 at 5-6). Agent Nicholson questioned Mr. Rivera as he lay handcuffed to a hospital bed. (Doc. 52 at 6). At the time, Mr. Rivera's cognition was impaired by several factors, including the morphine, "psychosis stemming from untreated schizoaffective and bipolar disorders," and excruciating pain. (Doc. 52 at 47-49).[6]

Four days later, Agent Nicholson went to see Mr. Rivera at the Bartow County Jail for the purpose of having Mr. Rivera execute a release

---

[6] The Magistrate recommended that the court grant Mr. Rivera's motion to suppress the statements he made to Agent Nicholson at the hospital, because the Magistrate "[could not] conclude it is more likely than not that Mr. Rivera maintained the 'requisite level of comprehension' to knowingly and intelligently understand his *Miranda* rights or appreciate the consequences of waiving them." (Doc. 52 at 48-49) (*citing Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

form for his hospital medical records. (Doc. 87-2 at 13; PSR ¶ 25). Although Agent Nicholson had sat at Mr. Rivera's bedside at the hospital and questioned him, Mr. Rivera had no recollection of who Agent Nicholson was or that he had talked to him before. (Doc. 87-2 at 13). He explained to Agent Nicholson that he suffered from schizoaffective disorder and that he was hallucinating when he was at the hospital. (Doc. 87-2 at 13). Mr. Rivera also said, "My kids [are] doing just fine. My kids are fine. I was hallucinating." (Doc. 78-2 at 13).

Mr. Rivera had very little recall of any of the events on November 17. (Doc. 87-2 at 13-14). When Agent Nicholson asked him where he had gotten the gun, Mr. Rivera responded "in the vicinity." (Doc. 87-2 at 14). Mr. Rivera had no recollection of pointing the gun at people in the parking lot or discharging the gun. (Doc. 87-2 at 14). When asked about his encounter with Sgt. Logue, Mr. Rivera said, "I don't even remember the officer." (Doc. 87-2 at 13; PSR ¶ 25). He was shocked to learn that he had fired a gunshot that had broken the front door glass of the gas station. (Doc. 87-2 at 14).

**C. Standards of Review**

This Court reviews a district court's Guidelines calculations *de novo*. *United States v. DeVegter*, 439 F.3d 1299, 1303 (11th Cir. 2006). Although the Guidelines are advisory, the district court must first determine the correct sentencing range. *United States v. Crawford*, 407 F.3d 1174, 1179 (11th Cir. 2005). Failing to properly calculate the sentencing

guideline range is a "significant procedural error" in sentencing. *Gall v. United States,* 552 U.S. 38, 49 (2007). "Misinterpreting the Guidelines effectively equates to failing to consult them properly." *United States v. Chambliss*, 267 Fed. Appx. 870, 873 (11th Cir. March 4, 2008) (unpublished).

The district court's factual findings on disputed sentencing issues are reviewed for clear error, but its interpretation and application of the Sentencing Guidelines are reviewed *de novo*. *United States v. Matos-Rodriguez*, 188 F.3d 1300, 1309 (11th Cir. 1999).

This Court reviews the reasonableness of a sentence under an abuse of discretion standard. *United States v. Kuhlman*, 711 F.3d 1321, 1326 (11th Cir. 2013). In reviewing for reasonableness, the Court considers whether the district court committed any significant procedural error and then whether the sentence is substantively reasonable in light of the relevant § 3553(a) factors and the totality of the circumstances. *United States v. Banks*, 778 Fed. Appx. 694, 697 (11th Cir. June 20, 2019) (unpublished). Procedural error includes not considering the relevant § 3553(a) factors, considering an improper § 3553(a) factor, selecting a sentence based on clearly erroneous facts, and inadequately explaining the chosen sentence. *United States v. Chilsolm*, 559 Fed. Appx. 800, 801 (11th Cir. March 11, 2014) (unpublished) (citing *Gall*, 552 U.S. at 51); *United States v. Hill*, 2024 WL 4603803, *1 (11th Cir. Oct. 29, 2024) (unpublished).

"A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives

significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). The party challenging the sentence bears the burden to show the sentence is unreasonable. *Banks, supra* at 697.

## SUMMARY OF THE ARGUMENT

I. Jose Rivera entered a guilty plea to two offenses — possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g) and possession of a stolen firearm in violation of 18 U.S.C. § 922(j). Both offenses are referenced to Sentencing Guideline § 2K2.1 However, § 2K2.1 contains a cross-reference provision, which states that if the defendant used or possessed any firearm in connection with the commission or attempted commission of another offense, apply the Sentencing Guideline for that other offense or attempted offense if it would provide a higher offense level. In this case, the district court applied the Sentencing Guideline for attempted murder or assault with intent to commit attempted murder, § 2A2.1, based upon Mr. Rivera's discharge of a firearm in the direction of Cartersville Police Officer Logue. For several reasons, the district court erred in applying 2A2.1. Both attempted murder and assault with intent to commit murder require a specific intent to kill. Mr. Rivera was in psychotic state and experiencing disorganized thinking at the time of the encounter with Sgt. Logue. He believed that persons had killed his children, which was not true. The facts and circumstances do not support a finding that Mr. Rivera intended to kill Sgt. Logue. The record also does not demonstrate the Mr. Rivera was attempting to commit an unlawful killing at the time. Given Mr. Rivera's mental state at the time, he did not have the requisite consciousness of wrongdoing.

II. Section 2A2.1 sets forth two alternative base offense levels. Level 33 applies if the object of the offense would have constituted first degree murder. Level 27 applies otherwise. First degree murder under federal law requires both malice aforethought and an element of premeditation. Any other murder is classified as second degree murder. Second degree murder requires malice aforethought but not premeditation. The district erroneously applied base offense level 33, because the record does not support a finding that Mr. Rivera attempted a premeditated killing of Sgt. Logue. The encounter between Mr. Rivera and Sgt. Logue was very short, the events happened quickly, and Mr. Rivera was in a mental state that caused him to be detached from reality and his thoughts to be disorganized. The record does not support necessary findings that Mr. Rivera had a "cool mind" capable of reflection and that he, in fact, deliberated for some period of time and came to a conscious decision that he would attempt to kill Sgt. Logue.

III. The district court erred in imposing the six-level sentencing enhancement under § 3A1.2(c)(1), because the record does not provide a basis to make the necessary evidentiary findings by a preponderance of the evidence. First, the record does not show that Mr. Rivera, who was in a psychotic state with disorganized thinking, knew or had reasonable cause to believe that Sgt. Logue was a law enforcement officer. Second, the record does not demonstrate that Mr. Rivera had a specific intent to

commit a battery against Sgt. Logue or to place him in fear of serious bodily injury when he discharged the firearm.

IV. The district court abused its discretion in imposing a total custodial sentence of 220 months upon Mr. Rivera. The sentence does not adequately account for the mitigating circumstances regarding Mr. Rivera's mental state at the time that he committed the offenses. It also does not account for the history of trauma that Mr. Rivera experienced, which led to him developing both a mental condition with psychotic features and a substance abuse disorder. Mr. Rivera was experiencing a great deal of psychological and emotional stress leading up to this incident. His use of methamphetamine and mental health conditions were likely both factors in his conduct underlying the charges.

Mr. Rivera's history has shown that when he received any form of treatment for his mental health conditions, he has not had a record of criminal offenses. Mr. Rivera's mental health conditions and substance abuse disorders are treatable. There have been improvements in the medications available and the modes of administration of the medications. Mr. Rivera is motivated for treatment and has developed insight into his need for treatment. These circumstances enhance his prospects for successful integration in the community.

## ARGUMENT AND CITATION OF AUTHORITY

### I. The District Court Erred in Sentencing Mr. Rivera Based on the Guideline for Attempted Murder and Assault with Intent to Commit Murder.

The charges of possession of a firearm as a convicted felon under 18 U.S.C. § 922(g) and possession of a stolen in violation of 18 U.S.C. § 922(j) are referenced to United States Sentencing Guideline § 2K2.1. *See* U.S.S.G. § 2K2.1, Statutory Provisions. However, there is a cross-reference provision in § 2K2.1(c), which states in relevant part:

> If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition cited in the offense of conviction with knowledge or intent that it would be used or possessed in connection with another offense, apply —
>
> (A) § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above. . . .

U.S.S.G § 2K2.1(c). Section 2X1.1 states that the base offense level should be "the base offense level for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a). Based on application of § 2K2.1(c), the court cross-referenced to U.S.S.G. § 2A2.1, which is designated for the offenses of assault with intent to commit murder and attempted murder.

The cross-reference was not proper here, because, unlike the offenses Mr. Rivera pled to, the offenses referenced to § 2A2.1 have specific intent elements that are not established by the record. "[A] 'specific intent' means 'the intent to accomplish the precise criminal act that one is later charged with.'" *United States v. Ortiz*, 318 F.3d 1030, 1036 n. 10 (11th Cir. 2003). An attempt to commit murder requires a specific intent to kill the victim. *Braxton v. United States*, 500 U.S. 344, 351 n. 1 (1991) ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill."); *see also* 11th Circuit Pattern Jury Instructions, Offense Instruction O47 (2024) (attempted murder requires an element that the Defendant "intended to kill the victim"). Likewise, assault with intent to commit murder requires a specific intent to commit murder. *United States v. Dreiling*, 806 Fed. Appx. 888, 890 (11th Cir. 2020) (unpublished). To apply the attempted-murder cross-reference, the district court was required to find by a preponderance of the evidence that Mr. Rivera possessed the specific intent to kill Sgt. Logue. *United States v. Miller*, 73 F.4th 427, 430 (6th Cir. 2023).

The Supreme Court has said:

> [A]s a general matter, our criminal law seeks to punish the 'vicious will.' With few exceptions, *wrongdoing must be conscious to be criminal*. Indeed, we have said that consciousness of wrongdoing is a principle as universal and persistent in mature systems of criminal law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

*Ruan v. United States*, 597 U.S. 450, 457 (2022) (emphasis added). "The 'central thought" is that a defendant must be 'blameworthy in mind' before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea*, scienter, *malice aforethought*, guilty knowledge, and the like."[7] *Elonis v. United States*, 575 U.S. 723, 734 (2015) (emphasis added).

In this case, there is insufficient evidence to establish that Mr. Rivera was "blameworthy in mind" when he fired a pistol in the direction of Sgt. Logue, that he intended to kill Sgt. Logue when he did so, and that he attempted to perpetrate an unlawful killing. On the first point, there is ample evidence that Mr. Rivera was experiencing a psychotic episode at the time he had the encounter with Sgt. Logue. Mr. Rivera has a very long history of suffering from a mental health condition with a psychotic component. In October 2010, a doctor diagnosed Mr. Rivera as suffering from depression, among other conditions, and prescribed him an antipsychotic medication, Seroquel. (Doc. 87-2 at 8). The dosage given would be used to treat Bipolar I Disorder, Schizophrenia, or Schizoaffective Disorder. (Doc. 87-2 at 20). In March 2011, a clinical psychological evaluation was conducted of Mr. Rivera for purposes of a New Jersey disability benefits assessment. (Doc. 87-2 at 7). Among other conditions, Mr. Rivera was diagnosed with Bipolar I Disorder, most recent episode

[7] "Malice aforethought" is an element of murder under federal law. 18 U.S.C. § 1111(a).

depressed – severe with psychotic features. (Doc. 87-2 at 7). Through another New Jersey clinical psychological disability evaluation conducted in November 2018, Mr. Rivera was diagnosed with Schizoaffective Disorder, Bipolar type. (Doc. 87-2 at 7). Dr. Shao and Dr. Hall, who performed a forensic evaluation of Mr. Rivera in connection with this case, diagnosed him as suffering from Bipolar I Disorder, most recent episode depressed with psychotic features. (Doc. 87-2 at 19-20). They did not entirely rule out Schizoaffective disorder – Bipolar type. (Doc. 87-2 at 21). They explained that Bipolar I Disorder with psychotic features has many similar or overlapping symptoms with Schizoaffective Disorder – Bipolar type. (Doc. 87-2 at 21). The primary difference is the persistency of the psychotic symptoms. (Doc. 87-2 at 21; Doc. 98 at 53-54). "[W]ith Schizoaffective Disorder, psychotic symptoms persist outside of manic or depressive episodes." (Doc. 87-2 at 21).

Dr. Shao reviewed extensive medical and psychological records regarding Mr. Rivera, closely reviewed surveillance videos of Mr. Rivera's behavior at the Circle K station gas station, the consignment shop where he stole the gun, and another store on the evening before. (Doc. 87-2 at 1-2; Doc. 98 at 48). She reviewed incident reports and pertinent witness statements regarding the events underlying the charges. (Doc. 87-2 at 1-2). She also interviewed Mr. Rivera twice. (Doc. 87-2 at 14). Dr. Hall interviewed Mr. Rivera as well and performed a battery of tests on Mr. Rivera. (Doc. 87-2 at 15-19). They opined that Mr. Rivera, who has no

recollection of the events at the gas station and consignment shop, was having a psychotic episode at the time of the events at the gas station. (Doc. 87-2 at 24).

Other evidence in the case is consistent with their opinion that Mr. Rivera was experiencing a psychotic episode when he encountered Sgt. Logue. Sgt. Logue first responded to a call that a person was pointing a gun at cars passing by a certain credit union. (PSR ¶ 9). Minutes later, the police were called to the gas station in response to a call that Mr. Rivera was pointing a gun at persons at the store and that he had possibly shot a store customer. (PSR ¶ 9). Mr. Rivera had not shot anyone. (PSR ¶ 18). Instead, he had discharged the gun and shattered the store's front glass door, with the bullet lodging in the door frame. (PSR ¶ 18). It is not clear that Mr. Rivera intentionally discharged the weapon, as, at the time, Mr. Rivera was standing next to a truck occupied by a store patron, yelling statements to the store patron, and the shot travelled in the direction of store. (PSR ¶ 17; Doc. 98 at 130). To the patron, Mr. Rivera was saying nonsensical things, such as "Boy, who runs this town" and they killed my son. (PSR ¶ 17; Doc. 87-2 at 11).

When Sgt. Logue arrived and engaged Mr. Rivera in the parking lot, he ordered Mr. Rivera at gunpoint multiple times to put his hands up. Except for one brief moment, Mr. Rivera did not show more than one of his hands at a time with his other hand behind his back. Mr. Rivera asked Sgt. Logue why he wanted him to put his hands up. He told Sgt. Logue, "They

killed my kids." He also said, "You can't shoot me because I don't have a gun." Seconds later, Mr. Rivera began to run.

After Mr. Rivera was shot, emergency medical personnel were called, and Mr. Rivera was transported to the local hospital. En route, an EMT and an accompanying police officer heard Mr. Rivera saying that the police officer had killed his children. The officer also recalled hearing Mr. Rivera say that the cop he shot had killed his kids and that Mr. Rivera would then say the cop had not killed his kids.

A Georgia Bureau of Investigations special agent went to the hospital and questioned Mr. Rivera, who was also administered morphine at the hospital. Four days later, the investigator went to the local jail for a follow-up meeting with Mr. Rivera. Mr. Rivera had no recollection of having seen the investigator. He told the investigator that he had been hallucinating at the time he was alleged to have committed the offenses. The record does not show that Mr. Rivera was conscious of wrongdoing at the time he fired the shot in the direction of Sgt. Logue as he was being chased by Sgt. Logue.

The district court stated the following:

> [A]t the end of the day, [Dr. Shao's] testimony is that the defendant didn't know nothing about nothing, you know, ultimately. . . I have no doubt that the defendant has some underlying mental health issue. But all the objective evidence is that he knew what he was doing was wrongful. He was hiding the gun from the police officer. He was backing up from the police officer. He was running from the police officer. He was telling the police officer, you can't shoot me unless I got a gun.

> And then he runs around the building past two corners and then comes back braced to shoot directly at the police officer.

(Doc. 98 at 136). The district court later added that it found it "more believable . . . that [Mr. Rivera] was trying to kill the police officer.]" (Doc. 98 at 138).

The district court acknowledged that Mr. Rivera suffers from a mental health condition. In sentencing Mr. Rivera, the district stated, "I have no doubt that you have mental health issues based on what we know that is objective. And I really have no doubt that it played a part but – in what happened that night." (Doc. 98 at 179). The court also granted Mr. Rivera a one-level downward departure under U.S.S.G. § 5H1.3, which authorizes the district court to depart from the sentencing guidelines if mental or emotional conditions of the defendant, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical case covered by the guidelines. Given the substantial evidence that Mr. Rivera's mental state was detached from reality and that his thoughts were scattered and disorganized, the facts relied upon by the court do not establish that Mr. Rivera more than likely had an awareness of wrongdoing when he discharged the gun in the direction of Sgt. Logue. Thus, the district court clearly erred in concluding that Mr. Rivera had attempted to murder Sgt. Logue.

The record also does not show that Mr. Rivera intended to kill Sgt. Logue when he discharged the gun. *Braxton v. United States*, *supra*, provides a helpful example in this regard. In *Braxton*, four United States Marshals went to Braxton's door for the purpose of executing a warrant for his arrest. 500 U.S. at 345. One of the marshals knocked. Although no one answered the door, the marshals could hear someone inside. *Id.* The marshal knocked again. *Id.* Again, no one answered. *Id.* The marshal unlocked the door and then broke a chain lock securing the door by kicking the door. *Id.* Contemporaneous with the door opening, a gunshot was fired through the door opening. *Id.* The gunshot lodged on the outside of the door just above the doorknob. *Id.* The door slammed shut, and the marshals withdrew. *Id.* Soon afterward, the marshal kicked the door open again. *Id.* Another gunshot was fired from inside the house. *Id.* It also lodged in the front door, about five feet from the floor. *Id.* The marshals withdrew again. *Id.* Eventually, Braxton, who had fired the shots, surrendered himself. *Id.*

Braxton was charged in a three-count indictment with attempting to kill a deputy United States Marshal in violation of 18 U.S.C. § 1114, assaulting a deputy marshal in violation of 18 U.S.C. § 111, and using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). *Id.* Braxton pled guilty to the assault and firearm counts. *Id.* At the subsequent sentencing hearing, the district court sentenced Braxton based on the

Sentencing Guideline for attempted murder, which was the only charge to which he had not confessed guilt. *Id.* at 346, 349.

On certiorari to the Supreme Court, one issue was whether the facts stipulated to by Braxton at his plea colloquy supported a finding by the district court that Braxton had intended to kill one of the marshals when he fired the gun. Writing for the Court, Justice Scalia noted that contrary to the position of the Court of Appeals, the clearly erroneous standard did not apply to the district court's conclusion that Braxton had attempted to kill one of the marshals because the determination was being made based on the meaning and effect of a stipulation rather than a factual finding. *Id*. at 350-351. Nevertheless, the Court's reasoning for what conclusions could logically be drawn from the stipulation are helpful for the analysis here.

Justice Scalia noted that Braxton had not stipulated that he shot "'at a marshal." *Id*. at 349. Instead, he had agreed that he "shot 'through the door opening and that the gunshot lodged in the front of the door just above the doorknob. That is outside of the front door.'" *Id*. (punctuation omitted). Even if Braxton had said he had shot at the marshal, that would not necessarily have been dispositive of the question of whether he intended to kill the marshal. Justice Scalia said that such a stipulation by Braxton would "perhaps" establish the necessary intent. *Id*. Justice Scalia went on to state:

> [E]ven if one could properly conclude that the stipulation 'specifically established' that Braxton had shot "at the marshals," *it would also have to have established that he did so with the intent of*

> *killing them*.* Not only is there nothing in the stipulation from which that could even be inferred, but the statements of Braxton's attorney at the hearing flatly deny it. . . .
>
> Braxton claims to have intended to frighten the marshals, not shoot them, and that claim is certainly consistent with the stipulation before us.
>
> We of course do not know what actually happened that morning in June, but that is not the question before us. The only issue for resolution is whether a stipulation that at best supports two reasonable readings—one that Braxton shot across the room at the marshals when they entered, and one that he shot across the room before they entered to frighten them off—is a stipulation that 'specifically establishes' that Braxton attempted to murder one of the marshals. It does not.[8]

*Id*. at 350-351.

In this case, the evidence is unclear as to what Mr. Rivera intended when he discharged the gun in the direction of Sgt. Logue. His thoughts were scattered, disorganized, and detached from reality. His presentation did not show an ability to think in logical sequence from one point to the next to the next.

To the extent any particular intent can be gleaned, the evidence is at least as supportive of the proposition that Mr. Rivera was attempting to

[8] At that time, United States Sentencing Guideline § 1B1.2 stated that "in the case of conviction by a plea of guilty or *nolo contendere* containing a stipulation that specifically establishes a more serious offense than the offense of conviction, the court shall apply the guideline in such chapter most applicable to the stipulated offense." *Braxton*, 500 U.S. at 344. (punctuation omitted).

frighten off Sgt. Logue when he shot as it is of the proposition that Mr. Rivera was attempting to kill Sgt. Logue. The fact that Mr. Rivera fired in Sgt. Logue's direction is insufficient to establish that he was trying to kill him. Even Sgt. Logue's assertion that he felt the bullet go by his head does not mean that Mr. Rivera was trying to kill him.

Moreover, the evidence in the record does not establish that Mr. Rivera knew that Sgt. Logue was a police officer at the time he discharged the weapon. That is significant, because murder under federal law is defined as "the *unlawful* killing of a human being with malice aforethought." 18 U.S.C. § 1111(a) (emphasis added). Immediately before and during the encounter with Sgt. Logue, Mr. Rivera stated that persons had killed his children or grandchildren. It is entirely possible that Mr. Rivera feared Sgt. Logue as someone who might do unjustified harm to him, and that Mr. Rivera was attempting to protect himself by hiding the gun from Sgt. Logue, saying you can't shoot me because I don't have a gun, and then running from Sgt. Logue. Even if it could be said that Mr. Rivera attempted to kill Sgt. Logue when he discharged the gun, the record does not show that Mr. Rivera was attempting to perpetrate an unlawful killing rather than protect himself from unjustified harm.

Without an adequate basis to reasonably determine by a preponderance that Mr. Rivera intended to kill Sgt. Logue when he fired the one shot, the court erred in cross-referencing to the attempted murder guideline. Moreover, as stated, the record does not show that Mr. Rivera

was attempting to perpetrate an unlawful killing. Lastly, the evidence does not adequately show that Mr. Rivera was conscious of wrongdoing, or in other words, was "blameworthy in mind" when he discharged the gun. For these reasons, the district court erred in concluding that Mr. Rivera committed either the offense of attempted murder or the offense of assault with intent to commit murder. Thus, the district court erred in cross-referencing to Sentencing Guideline § 2A2.1.

## II. Assuming Arguendo that the District Court Did Not Err in Applying Guideline § 2A2.1, It Erred in Applying the Base Offense Level for Attempted First Degree Murder.

Assuming the district court properly determined that Sentencing Guideline § 2A2.1 was applicable, the court erred in applying base offense level 33 instead of 27. In relevant part, § 2A2.1 states that the base offense level is 33, if the object of the offense would have constituted first degree murder, or 27 otherwise. U.S.S.G. § 2A2.1(a). For purposes of § 2A2.1, "'[f]irst degree murder' means conduct that, if committed within the special maritime and territorial jurisdiction of the United States, would constitute first degree murder under 18 U.S.C. § 1111." U.S.S.G. § 2A2.1 n. 1. Section 1111 states:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or

> children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree.

18 U.S.C. § 1111(a) (emphasis added). Second degree murder also requires malice aforethought. 18 U.S.C. § 1111(a); *Alvarado-Linares v. United States*, 44 F.4th 1334, 1345 (11th Cir. 2022); *United States v. Free*, 574 F.2d 1221, 1222 (5th Cir. 1978).[9] First degree murder requires both malice aforethought and an element of premeditation. *Alvarado-Linares*, 44 F.4th at 1345.

The presentence report asserted that Mr. Rivera's conduct constituted an attempt to commit first degree murder on the grounds that his conduct "amounted to an ambush and a premeditated attempt to kill the officer." (PSR ¶ 40). Mr. Rivera objected. (Doc. 79 at 10-15). Mr. Rivera argued that Mr. Rivera's conduct did not constitute an ambush or a premeditated attempt to kill Sgt. Logue. (Doc. 79 at 11-12).[10]

At the sentencing hearing, the Government did not assert and the district court did not find that Mr. Rivera had lain in wait for Sgt. Logue. Instead, the Government travelled under the theory that Mr. Rivera had committed a premeditated attempt to kill Sgt. Logue. (Doc. 98 at 9-10, 140).

---

[9] Decisions of the Fifth Circuit Court of Appeals prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[10] Section 1111 does not use the term "ambush." Instead, it states in relevant part that first degree murder includes "murder perpetrated by poison, *lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing*." 18 U.S.C. § 1111(a) (emphasis added).

The court ultimately found the Government had proven by a preponderance that Mr. Rivera had the intent necessary to kill Sgt. Logue though he was unsuccessful in doing so. (Doc. 98 at 142). The court did not clearly find that Mr. Rivera acted with premeditation; nor does the record support such a conclusion.

Eleventh Circuit pattern instruction O45.1 states, in part:

> To kill with 'premeditated intent' is to kill in cold blood after the accused has had time to think over the matter and formed the intent to kill. There's no exact time that must pass between forming the intent to kill and the killing itself. But it must be enough time for the killer to be fully conscious of having the intent to kill.

11th Cir. Pattern Jury Instructions, Offense Instruction O45.1 (2024) (emphasis added). Eleventh Circuit pattern jury instruction O45.3 cites *United States v. Shaw*, 701 F.2d 367, 392 (5th Cir. 1983), for the proposition that "[s]ection 1111 retains the common law distinction between second degree murder, which requires a killing with malice aforethought, and first degree murder, which in addition to malice aforethought requires a killing with *premeditation and deliberation*." (emphasis added). *Shaw* goes on to state:

> Although it is clear that deliberation and premeditation under § 1111 involve a prior design to commit murder, no particular period of time is necessary for such deliberation and premeditation. *See United States v. Blue Thunder*, 604 F.2d 550, 553 (8th Cir.) cert. denied, 444 U.S. 902, 100 S.Ct. 215, 62 L.Ed.2d 139 (1979); *United States v. Brown*, 518 F.2d 821, 826 (7th Cir.), cert. denied, 423 U.S. 917, 96 S.Ct. 225, 46 L.Ed.2d 146 (1975). There must be some appreciable time for reflection and consideration

> before execution of the act, although the period of time 'does not require the lapse of days or hours or even minutes.' *Bostic v. United States*, 94 F.2d 636, 638 (D.C. Cir. 1937), cert. denied, 303 U.S. 635, 58 S.Ct. 523, 82 L.Ed. 1095 (1938).
>
> The distinction which marks the line between 'deliberation' sufficient to support a conviction of first degree murder and the lesser killing with malice which supports conviction of second degree murder is less than clear. Commentators agree that the difference between the two standards is vague and obscure, *see* W. LaFave & A. Scott, Criminal Law § 73 (1972); Cardozo, Law and Literature and Other Essays, 99–100 (1931). Perhaps the best that can be said of deliberation is that it requires a 'cool mind' that is capable of reflection, and of premeditation that it requires that the one with the 'cool mind' did, in fact, reflect, at least for a short period of time before his act of killing. LaFave, *supra* at 563.

*Id*. at 392-393. The Sixth Circuit has observed that "[a] killing is premeditated when it is the result of planning and deliberation." *United States v. Ingle*, 460 Fed. Appx. 593, 596 (6th Cir. March 13, 2012) (unpublished).

The evidence in this case does not show that Mr. Rivera acted with a premeditated intent to kill Sgt. Logue in cold blood. The encounter between Sgt. Logue and Mr. Rivera was very brief. Mr. Rivera fled after a short dialogue with Sgt. Logue, and seconds into the chase, he paused and discharged his weapon. There is no indication that Mr. Rivera formed an intent to kill Sgt. Logue, had time to reflect on the matter, and then consciously decided to act on the intent that he had formed. Mr. Rivera's psychotic state also impaired an ability to form a premeditated intent.

It has not been proven — not even by a preponderance —that in discharging the gun Mr. Rivera acted with a "'cool mind' that [was] capable of reflection." *Shaw*, 701 F.2d at 392-392. The Government also did not prove that "with the 'cool mind'" Mr. Rivera "*did, in fact*, reflect, at least for a short period of time before his act of [attempted] killing." *Id.* (emphasis added).

This Court has observed that "the preponderance standard is not toothless," although it is not as rigorous as the reasonable doubt or clear and convincing standards. *United States v. Sikes*, 2024 WL 3220708, *2 (11th Cir. June 28, 2024) (unpublished) (citing *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995). After the district court ruled that it would cross-reference to § 2A2.1 and apply the higher base offense level, which applies to attempt to commit first degree murder, the Government asked the court to address whether Mr. Rivera had the ability to have premeditation. (Doc. 98 at 140). The court responded, "Well yeah. So that's obviously inherent in my ruling. A defendant can have premeditation in an instant. And that's exactly what the facts appear to me in this case." (Doc. 98 at 140). Then, the court said that it had already described the factors that it had relied upon. The court appeared to be referring to its reasoning for concluding that Mr. Rivera had attempted to kill Sgt. Logue. (Doc. 98 at 136-140). The court then noted the following in paraphrase: he knows it's a police officer; he knows he's not supposed to have a gun; he also knows that he's been acting in an inappropriate way

before the officer arrives, such as shooting at an occupied building; he refuses to show his hands to the police officer on multiple occasions; when the officer demanded that he show his hands, he obviously placed the gun into his pants and showed both hands and then retreated to having one hand behind his back; he starts backing away from the police officer, talking about the police officer can't shoot him because there's no gun; he runs from the police officer; he goes around the building, two corners; he turns, re-appears around the corner he had has already gone around and fires at the police officer. (Doc. 98 at 140-141). The court said that it believed there was adequate opportunity for Mr. Rivera to develop the intent necessary to support a charge of murder. (Doc. 98 at 141).

The litany of facts listed by the court does not show that Mr. Rivera had the ability to reflect with the "a cool mind" and that he did, in fact, reflect for some period on whether to attempt to kill Sgt. Logue before making a conscious decision to do so. Under these circumstances, the requirements for first degree murder were not met. Assuming application of Guideline § 2A2.1, the district court should have applied base offense level 27 for second degree attempted murder rather than 33 for first degree attempted murder.

## III. The District Court Erred in Imposing the Six-Level Enhancement under Guideline § 3A1.2(c)(1) for Official Victim.

Over Mr. Rivera's objection, the district court imposed a six-level enhancement based upon application of U.S.S.G. § 3A1.2(c)(1), which states:

> If, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable — knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom . . .,
>
> increase by 6 levels.

U.S.S.G. § 3A1.2(c)(1). Application note 4(A) states that "[s]ubsection (c) applies in circumstances tantamount to aggravated assault [] against a law enforcement officer, committed in the course of, or in the immediate flight following, another offense." U.S.S.G. § 3A1.2 n. 4(A).

For this enhancement to apply, the defendant must know or have reasonable cause to believe that the person with whom he is engaged is a law enforcement officer. U.S.S.G. § 3A1.2(c)(1). The defendant must also commit an aggravated assault upon the law enforcement officer, including having the necessary *mens rea. See id.*

Neither § 3A1.2 nor the commentary to that section define the term aggravated assault or the term assault.[11] The common law is considered

[11] Guideline § 2A2.2 applies to aggravated assault offenses. For purposes of that guideline, the commentary to § 2A2.2 defines aggravated assault as including "a felonious assault that involved a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon. U.S.S.G. § 2A2.2 n. 1. The commentary to § 1B1.1 states, "Definitions of terms also may appear in other sections. Such definitions are not designed for general applicability; therefore, their applicability to sections other than those expressly referenced must be determined on a case by case basis." U.S.S.G. § 1B1.1 n. 2.

when the Guidelines do not define an operative term. *See Chapman v. United States*, 500 U.S. 453, 461-62 (1991). It does not appear that this Court has endeavored to precisely define aggravated assault or assault for purposes of Guideline § 3A1.2. Other Circuits that have done so have determined that there are two forms of assault recognized under the common law: (1) an attempted battery; and (2) the deliberate infliction of a reasonable fear of injury. *United States v. Gonzales*, 931 F.3d 1219, 1221 (10th Cir. 2019); *United States v. Pruitt*, 999 F.3d 1017, 1023 (listing cases from other Circuits). Both forms of assault require a specific intent —either an intent to cause physical injury to the victim or an intent to instill fear in another. *Gonzales* at 1221-1222, n. 1 (considering scholarly commentaries and citing *United States v. Delis*, 558 F.3d 177, 180 (2nd Cir. 2009); *United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010); *United States v. Lamott*, 831 F.3d 1153, 1156 (9th Cir. 2016)); *Pruitt*, 999 F.3d at 1023.

In *Gonzales*, the defendant was convicted of possessing a firearm as a convicted felon, and the district court applied an enhancement under § 3A1.2(c)(1) for assaulting a law enforcement officer during the course of the offense. *Gonzales*, 931 F.2d at 1220. The court based the enhancement on the second form of assault. *Id*. at 1220-1222. The Tenth Circuit held that the § 3A1.2(c)(1) enhancement would apply only if Gonzales had a specific intent to put a law enforcement officer in fear of serious bodily injury. 931 F.2d at 1224. Because the district court had not made a finding as to whether Gonzales intended to instill fear of bodily injury in a law

enforcement officer, the Tenth Circuit vacated the sentence and remanded for the district court to address the question of Gonzales' intent. *Id*. at 1224.

In *Pruitt*, the Sixth Circuit also vacated the defendant's sentence and remanded for the district court to "set forth the specific facts it finds by a preponderance of the evidence and explain why those facts establish an assault as contemplated by the official-victim enhancement." 999 F.3d at 1025. In part, the Sixth Circuit stated, "[A]lthough the district court referred to 'assaultive behavior,' we do not know what conduct the district court determined constituted the assault element of the enhancement and why the district court found that conduct met the definition of assault." *Id*. at 1025. The Court added, "[W]e do not know what the district found Pruitt's intent was with respect to any of his actions." *Id*.

A panel decision from this Court also indicates that the defendant's intent is a consideration in determining whether the official victim enhancement should apply. In *United States v. Jackson*, 728 Fed. Appx. 969, 970 (11th Cir. March 23, 2018) (unpublished), the defendant Jackson, who was driving a car, approached a guard outside the gate of a military base. The guard came to suspect that Jackson was driving under the influence of alcohol, and he directed Jackson to turn off the car and give him the keys. *Id*. Instead, Jackson looked around in all directions, gripped the steering wheel, and accelerated the vehicle, hitting the officer. *Id*. The officer held the driver's side window frame, and he was dragged for approximately

fifteen feet before he fell off the car. *Id*. The officer's foot was run over, and he suffered injuries including muscle strains and scrapes. *Id*.

Jackson was charged with one count of assaulting a federal officer in violation of 18 U.S.C. 111(a)(1), (b).[12] *Id*. One issue Jackson raised on appeal was whether the district court had erred in applying an official victim enhancement under § 3A1.2. *Id*. at 972. Jackson asserted that his conduct was reckless but unintentional. *Id*. The panel concluded:

> Based on our conclusion that the district court did not clearly err in finding that *Jackson acted with intent to injure the officer*, and because there was sufficient evidence to support the court's finding that Jackson knew or had reasonable cause to believe that the officer—who wore a police uniform with a badge—was a law enforcement officer, see § 3A1.2(c)(1), the court did not err in applying the official victim enhancement.

*Id*. at 972-973 (emphasis added).

[12] This Court has held that assault under 18 U.S.C. § 111(a) is a general intent crime. *United States v. Ettinger*, 344 F.3d 1149, 1160 (11th Cir. 2003). However, knowing commission of the act and intentionality are required for conviction. *Id*. at 1155, 1158; *see also* Eleventh Circuit Pattern Jury Instructions, Offense Instruction O1.1 (2024). The defendant must have the intent to do the acts specified in § 111 — forcibly assault, resist, oppose, impede or interfere with a federal officer while he is engaged in or account of the performance of his official duties. *Ettinger*, 344 F.3d at 1154-1155. For purposes of § 111(a), the term "'forcible assault' means any willful attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so, and includes any intentional display of force that would give a reasonable person cause to expect immediate bodily harm . . ." *Id*. at 1159.

In this case, the evidence does not show by a preponderance that Mr. Rivera had the intent to commit a battery against Sgt. Logue or to put him in fear of serious bodily injury. While the district court found that Mr. Rivera intended to shoot at Sgt. Logue and that he was trying to hit him, (doc. 98 a 137), the record does not demonstrate that. As discussed above, Mr. Rivera was acting in a mental state that was detached from reality, and his thinking was scattered and disorganized. There was a general lack of purpose or direction in Mr. Rivera's actions. Mr. Rivera was also acting under a delusion that his children or grandchildren had been harmed. It is reasonably possible that he feared he himself was in danger, particularly when he was being chased. Thus, it is reasonably possible that Mr. Rivera's intent in discharging the weapon was defensive rather than offensive in nature.

For the enhancement to apply, the court was also required to find that Mr. Rivera knew or had reasonable cause to believe that the person with whom he was engaged was a law enforcement officer. U.S.S.G. § 3A1.2(c)(1). While the district court did find Mr. Rivera knew Sgt. Logue was a police officer, (doc. 98 at 137), the record, again, does not bear that out. As Dr. Shao indicated, it is quite possible that in his mental state Mr. Rivera did not know that Sgt. Logue was a law enforcement officer. (Doc. 98 at 99). Mr. Rivera was not "holding a very solid train of thought" at the time. (Doc. 98 at 99). Given his psychotic state and disorganized thinking, hiding the gun from Sgt. Logue and running from him do not establish that

he knew Sgt. Logue was a law enforcement officer. The court should not have applied the official victim enhancement under the circumstances.

## IV. The District Court Substantively Erred by Sentencing Mr. Rivera to Serve 220 Months in Custody Despite Attendant Mitigating Circumstances.

18 U.S.C. § 3553(a) sets forth a list of factors that district court must consider when imposing a sentence. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (4) the need to protect the public from further crimes of the defendant; (5) the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (6) the kinds of sentences available; (7) the kinds of sentence and the sentencing range established by the Guidelines; (8) any pertinent policy statements issued by the Sentencing Commission, (9) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (10) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a). The court must impose a sentence that is "sufficient, but not greater than necessary" to meet the stated aims of reflecting the seriousness of the offense, promoting respect for the law, providing just punishment,

deterring criminal conduct, protecting the public from further crimes of the defendant, and providing the defendant with needed training, care, and correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). "A sentencing court may not presume that a sentence within the applicable guideline range is reasonable." *United States v. Green*, 375 Fed. Appx. 940, 942 (11th Cir. Apr. 21, 2010) (unpublished) (quoting *Nelson v. United States*, 129 S.Ct. 890, 892 (2009)). The court abused its discretion in imposing a sentence of 220 months in prison, because the sentence failed to adequately account for Mr. Rivera's mental health condition, its impact on his conduct in the case, and his trauma history that led him to developing not only the mental health condition but the substance use disorder that also played a role in the offense conduct. The court also failed to adequately take into account the impact of the statutory maximum punishment in determining a reasonable sentence.

After cross-referencing to § 2A2.1(a)(1) and applying the base offense and the official victim enhancement, the court determined that the adjusted offense adjusted offense level was 39 and that the criminal history category was II. The resulting sentencing guideline range before an adjustment for acceptance of responsibility was 292-365 months. Most of that range could not be imposed, because the statutory maximum punishment was 300 months. (PSR p. 25). The court granted a three-level downward adjustment for acceptance of responsibility under § 3E1.1, and the applicable guideline range became 210-262 months. The court downwardly departed one level

based on 5H1.3 (mental and emotional conditions), and the guideline range became 188-235 months. Then, the court imposed a sentence of 220 months, which was towards higher end of that range. 220 months was also within the pre-departure range of 210-262 months. Thus, effectively, the court did not depart at all.

At the time of these offenses, Mr. Rivera was homeless, alone, and lacking in material support and family support in the area. He was under a great deal of psychological and emotional stress. He committed the instant offenses while he was in a psychotic state, disorganized in his thoughts, and carrying a mistaken belief that members of his family had been harmed. The conduct involved in this case is a departure from Mr. Rivera's prior history, including his offense history. Mr. Rivera, who was 45 years old at the time of the offense, had only one prior felony conviction, and much of his criminal history was dated, having occurred during the period 1997 to 2003, when Mr. Rivera was 19 to 26. (PSR ¶¶ 51, 53, 23, 25, 26, 30).

As the court noted, Mr. Rivera's use of methamphetamine also played a role, as it may have triggered a psychotic feature of Mr. Rivera's mental health condition. The court did not give consideration to Mr. Rivera's trauma history in his youth and his exposure to substance abuse by close family members as a youth that led to his own development of a substance use problem. Dr. Shao testified that Mr. Rivera's mental health conditions and substance use disorders are treatable. Further, as she noted, Mr. Rivera's history has shown that when he has received mental health

treatment, be it optimal or not, he has not had a record of committing criminal offenses. (Doc. 98 at 87). Mr. Rivera is very motivated to stay engaged with his mental health treatments, and the medications and modes of administration available now are more effective than what Mr. Rivera previously received. The court did not give adequate consideration to these factors in imposing a sentence upon Mr. Rivera, and the result was a sentence that was substantively unreasonable under the § 3553(a) framework.

## CONCLUSION

Mr. Rivera asks this Court to vacate the sentence the district court imposed on him and to remand for re-sentencing under the Sentencing Guideline for firearms offenses, §2K2.1. Alternatively, Mr. Rivera asks that the Court remand for re-sentencing with application of base offense level 27 for attempted second degree murder rather than 33 for attempted first degree murder. Mr. Rivera also asks that the Court remand for re-sentencing without application of the official victim enhancement in Guideline § 3A1.2. Lastly, Mr. Rivera asks the Court to remand for re-sentencing with direction that the court impose a lower custodial sentence in light of mitigating circumstances relating to Mr. Rivera's offense conduct and his personal history and characteristics.

KENDAL D. SILAS
Counsel for Jose Rivera

## CERTIFICATE OF COMPLIANCE AND SERVICE

This is to certify that the foregoing brief is in compliance with Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in Book Antiqua 14 point, a proportionally-spaced typeface, using the Microsoft Word 2016 word processing software. Moreover, this brief also complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it includes no more than 12,975 words, according to the same software. Finally, on the date set forth below, counsel uploaded this brief to the Court's web site, which promptly served opposing counsel:

CALVIN LEIPOLD, III
LAWRENCE R. SOMMERFELD
Assistant United States Attorneys
United States Attorney's Office
United States Courthouse
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

March 25, 2025.

KENDAL D. SILAS
Federal Defender Program, Inc.
101 Marietta St., NW, Suite 1500
Atlanta, GA 30303
(404) 688-7530
Kendal_Silas@FD.org

Counsel for Jose Rivera